IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRYAN SHEPPARD,

     Plaintiff,

    v.

MARTINS AITO, *et al.*,

     Defendants.

                \*

                \*

                \*        Civil Action No. 8:17-cv-3140-PX

                \*        (consolidated with 17-cv-3141)

                \*

              \*\*\*

## MEMORANDUM OPINION

Pending in this prisoner civil rights action are motions to dismiss, or in the alternative, for summary judgment filed by Defendants Martins Aito, Farhan Younas, Elwyn Edwards II, Foluso Fekoya, and Chris Esser. ECF Nos. 76, 78, 104.[1] The motions have been fully briefed and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the Court grants in part and denies in part the motions for summary judgment.

### I. Background

Maryland Department of Safety and Correctional Services ("DOC") correctional officers are charged with maintaining safety and security in Maryland's prisons. This responsibility includes quelling disturbances that crop up in prison settings. To perform their jobs adequately, officers are trained that they may use force when necessary to restore discipline or bring an inmate under control. ECF No. 78-2 ¶ 3. *See Whitley v. Albers*, 475 U.S. 312, 320–21 (1986).

To aid them in this necessary and sometimes very dangerous function, correctional officers are given an array of tools, such as handcuffs, batons, and protective gear. One such

---

[1] All references to Defendant Younas' motion to dismiss and exhibits are to the earlier filed motion to dismiss at ECF No. 43, which Younas renews at ECF No. 76. Citations to record evidence related to the other Defendants may also refer to exhibits previously filed.

device is oleoresin capsicum ("OC") spray, colloquially known as "pepper spray."  ECF No. 78-2 ¶ 3.  DOC officers are issued both a small canister of OC spray and a larger fogger-style spray.  *Id.*  Officers understand that the "fogger" presents greater risk to inmates and "should be expected to cause serious damage or death."  *Id.*  Whenever OC spray is deployed on an inmate, officers are expected to render timely medical aid when they may safely do so.  *Id.*  Once sprayed, an inmate is to be evaluated and treated at the prison medical unit or, if necessary, correctional officers must provide immediate first aid and seek prompt medical assistance.  *Id.* ¶¶ 2–3; *see* ECF No. 121-7 at p. 1.[2]

On the evening of September 23, 2017, DOC inmates, Bryan Sheppard and Grant Holley, were housed as cellmates in the disciplinary or "segregation" tier at Jessup Correctional Institution ("JCI").  ECF Nos. 121-1 ¶ 2; 78-2 ¶ 4.  Earlier that evening, inmates on that tier had been throwing refuse and other items from their cells onto the hallway.  *See* ECF Nos. 78-2 ¶ 4; 103-4 ¶ 6.  No evidence reflects that Holley or Sheppard had been throwing such items.  Nor is there any evidence that any officers had been injured as a result.

Around 10:45 p.m., correctional officers began "the count," a process whereby they confirm that all prisoners are in their assigned cells.  In the segregation tier, a correctional officer walks the hallway and peers into the cell through a window without opening the cell door.  ECF No. 78-2 ¶ 4.  At about 10:47 p.m., Defendant Correctional Officer II, Martins Aito ("Aito") approached Sheppard and Holley's cell.  At that time, and as corroborated by video surveillance footage, Holley's arm was hanging out of the door's feed slot.  *Id.* ¶ 5; ECF No. 43-2 at

---

[2] Although Defendant Aito's declaration corroborates the pertinent use of force protocol materials, Defendants urge the Court to disregard the document as "unauthenticated."  ECF No. 136 at 2.  The Court takes judicial notice of the training materials, posted on the DOC website.  *Police Training and Standards Commission*, Maryland.gov, https://mdle.net/standards.htm (last visited July 28, 2021)*; United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (explaining that courts "routinely take judicial notice of information contained on state and federal government websites.") (citing cases).

22:47:17.4.  Aito also attests that the cell window was blocked so he could not see inside.  ECF No. 78-2 ¶ 5.  Sheppard maintains that he had not blocked the window.  ECF No. 121-1 ¶ 11.[3]

As Aito approached the inmates' cell window, he asked to see Sheppard; but according to the officer, Holley declined to move.  ECF No. 78-2 ¶ 5.  Video footage captures what appears to be Aito talking into the feed slot, at which point Holley appears to swipe at the papers in Aito's hand.  *Id.*; ECF No. 43-2 at 22:47:50–48:00.  Holley and Aito next can be seen swatting at each other and Aito appears to move toward the feed slot.  ECF No. 43-2 at 22:47:58–48:02.  At the same time, liquid is splashed through the feed slot, which Aito believes was feces and bleach.  ECF No. 78-2 ¶¶ 5, 6.  The cell door remained closed and locked, and so Aito was free to move away from the door without any further interaction.

And yet, Aito next appears to spray his OC canister into the feed slot several times in rapid succession.  ECF No. 43-2 at 22:48:11–48:27.  In between each use of the canister, it appears as if liquid was thrown toward Aito through the slot.  After spraying three or four shots of OC into the cell, Aito can be seen leaving the tier abruptly.  *Id.* at 22:48:27–48:40.  No other officer followed behind Aito to check on the inmates following Aito's use of his OC spray cannister.

Aito headed directly to the control center to return his equipment, including the OC spray canister, but he never reported that he had used it *or* that it had supposedly malfunctioned.  ECF No. 78-2 ¶ 8.  Aito next documented the occurrence in a handwritten "matter of record."[4]  ECF

---

[3] Defendants object to the Court considering Sheppard's sworn declaration at ECF No. 121-1 as part of the record.  They maintain that it fails to comply with Federal Rule of Civil Procedure 56(c)(4) because it does not expressly state that the declaration is based on Sheppard's personal knowledge.  ECF No. 136 at 1–2.  The Court rejects this argument because the plain language of the declaration makes clear that the information is based on his personal knowledge and Sheppard swears to its truth under penalties of perjury.  *See* 28 U.S.C. § 1746.  *See also J&J Sports Prods., Inc. v. Sandoval & Sandoval, Inc.*, No. CBD-17-2413, 2018 WL 6323117, at *2 (D. Md. Dec. 4, 2018).

[4] Aito claims that he was also seen at Baltimore-Washington Medical Center for injuries to his hand and was relieved of his duties for nearly a month, yet no records corroborate these claims, and other internal DOC

No. 125-4 at 41.  This statement, written contemporaneously with the incident, contradicts the video footage in meaningful ways.  Aito wrote that Holley had "grabbed" and "squeezed" Aito's wrist which caused Aito to "close" the feed slot.  *Id.*  Aito further describes how "inmate Grant then held the slot to my 2nd and index finger, thereby hurting my right wrist and fingers" and "as [Aito] bent down in excruciating pain, over the excruciating pain, Inmate Grant Holley then assaulted [him] with an unknown substance of feces and bleach liquid."  *Id*.  But the video shows no grabbing or twisting of Aito's wrist, or his bending down in "excruciating pain."  Lastly, and contrary to the video, Aito makes no mention of deploying his OC cannister.

In connection with this case, Aito also submitted a separate sworn declaration which diverges from his first written statement in important ways.  Although Aito in his declaration now admits to using his OC cannister, he claims he only did so once, but that the OC canister "did not work as intended . . . [or] depress properly."  ECF No. 78-2 ¶ 6.  Aito also attests that after he attempted to spray, he could see Sheppard through the feed slot standing up in the back of the cell with his hands in front, saying to Aito "[y]ou need to stop this nonsense."  *Id.* ¶ 7.  But this detail was wholly missing from his first statement and does not jibe with the events depicted on the video.

After Aito left the tier, Defendant Sergeant Foluso Fekoya ("Fekoya"), the Officer in Charge, directed Defendants Correctional Officers II Farhan Younas ("Younas") and Kevin Foxx ("Foxx") to continue the count.  ECF No. 43-5 ¶ 4.  Younas and Foxx arrived on the wing around 11:00 p.m.  *See* ECF No. 43-2 at 22:59:40–23:02:00.  On the video footage, Younas can be seen walking up to and then past Sheppard and Holley's cell without stopping to look through

---

reports affirmatively state that Aito suffered no injuries.  *Compare* ECF No. 78-2 ¶ 10 *with* ECF Nos. 136-3 at 6 ("COII Aito advised that he wasn't injured"); 136-5 at 4 (internal investigative report noting that "[t]here were no [staff] injuries.").

the cell window.  *Id.* at 23:02:27–02:30.  The video also appears to capture Younas moving slightly out of the way as to avoid coming into contact with what appears to be liquid.  The video quality is less than ideal, so it is difficult to see whether Younas was attempting to avoid liquid on the floor or liquid thrown in his direction.

Younas, too, submits a detailed sworn declaration.  At length, he describes the difficulties presented for officers to be able to see into an inmate's cell, given the size, shape, and positioning of the cell window and lighting.  ECF No. 103-2 ¶¶ 3–13.  Younas also makes clear that he could not see into the cell and so he never verified their presence.  *Id.* ¶ 13.  The video also depicts that Younas immediately left the tier without finishing the count.  ECF No. 43-2 at 23:02:37; *see also* ECF No. 103-2 ¶ 15.

A few minutes later, Foxx approached the cell to continue the count.  Video footage shows that Foxx also seemingly reacted to what he attests is liquid thrown from Holley and Sheppard's cell.  ECF No. 43-2 at 23:07:45–07:49.  But again, the video footage is not clear enough to show whether Foxx reacted to liquid already on the hallway floor or coming from the cell.  What is clear, however, is that Foxx immediately removed his OC fogger, bent down, shot OC through the gap at the bottom of the closed cell door, and quickly walked away.  *See* ECF No. 43-2 at 23:07:45–07:55; *see also* ECF No. 78-4 at 44.  Like Aito, Foxx did nothing to check on either inmate after using the OC spray.  In a written statement provided that evening, Foxx candidly admits that he used the OC fogger "as an impulsive initial reaction" and essentially without justification.  ECF No. 78-4 at 44.

Younas and Foxx reported to Fekoya about the liquid thrown at them.  In Foxx's written report and in his Answer to the Amended Complaint, he indicates that he also notified Fekoya and Defendant Captain Elwyn Edwards II ("Edwards") of his having used the OC fogger in the

5

cell.  ECF No. 133 ¶ 46; *see also* ECF No. 78-4 at 44 (Foxx explaining that he "notified [his] building sergeant of the incident.").  Aito corroborates that Foxx returned to the administrative building after his count and stated that he (Foxx) had deployed his OC fogger.  ECF No. 78-2 ¶ 9.  In contrast, Fekoya attests that Foxx did not mention anything to him about deploying OC spray.  ECF No. 103-5 ¶ 7.

Fekoya maintains that he reported to his commanding officer, Edwards, that the inmates had thrown liquid on the other officers.  ECF Nos. 103-7 ¶ 4; 103-5 ¶¶ 8, 13.  Edwards, in turn, directed that a shield should be put in front of Holley and Sheppard's cell to protect officers from liquid expelled or other projectiles.  ECF No. 103-5 ¶ 8.  Video footage shows Fekoya placing the shield in front of the cell at 11:17 p.m.  ECF No. 43-2 at 23:16:20–18:24.  In his sworn declaration, Fekoya maintains that he too could not see into the cell, but somehow knew the cell door was "barricaded."  Fekoya describes the men as "yelling and laughing" with no apparent injuries.  *See* ECF No. 103-5 ¶¶ 9–15.

By contrast, Shepard and Holley describe a very different version of events.  Sheppard recounts that when Aito first approached the cell, he had been sitting on his bed reading.  ECF No. 121-1 ¶ 3.  Sheppard recalls Holley and Aito beginning to argue and then Aito spraying OC into the cell through the feed slot.  *Id.* ¶¶ 3–4.  Because both men have asthma, they immediately had difficulty breathing.  *Id.* ¶ 4; ECF Nos. 104-14 at 41; 149-13 at 4.  The spray burned their eyes, noses, and throats and they began to pound on the door for help.  ECF Nos. 121-1 ¶ 4; 157-1 ¶ 5.

Then, after Foxx fogged the cell, both men lost consciousness.  ECF Nos. 121-1 ¶¶ 6–7; 157-1 ¶ 8.  Sheppard fell to the ground and struck his head against the cell floor.  ECF Nos. 121-1 ¶ 7; 103-4 at p. 8 (photograph of head wound); *see also* ECF No. 43-3 at 58 (medical records

documenting wounds).  Sheppard eventually regained consciousness and saw Holley lying in his own urine.  ECF No. 121-1 ¶ 8.  Sheppard next pounded on the door and yelled for medical help until Major Samson Balogun responded.  *Id.* ¶ 9; ECF Nos. 121-6 at p. 3.  *See also* ECF No. 103-4 ¶ 8.

Although Sheppard does not make clear how long he and Holley remained in the cell before Balogun arrived, Balogun attests that it was after 3:00 a.m. before he was directed to the tier.[5]  ECF No. 103-4 ¶ 3.  Even more troubling, for the nearly four hours between Foxx using the OC fogger and Balogun reporting to the cell, there is no surveillance footage and no coherent explanation for why the footage had not been kept pending resolution of an extensive internal investigation on the officers' conduct that night.  *Cf.* ECF No. 160-7 (attesting to 45-day window to burn video).  Nor do Defendants clearly document their whereabouts or explain with any cogency why they did not even try to remove the men from their cells.  *Compare* ECF No. 103-7 ¶ 9 (Edwards attesting that because the men had barricaded themselves in and were interacting with officers he saw "no need for a forced extraction"); *with* ECF No. 103-5 ¶ 16 (Fekoya explaining that cell extraction deemed "impossible" because the tier was "short staffed").

When Balogun finally entered the cell, he observed Sheppard with a knot on his head, ECF No. 103-4 ¶ 17, and he found Holley lying on the floor "disoriented."  *Id.* ¶ 13.  Both men were taken to the medical unit, Holley by wheelchair.  *Id.* ¶ 16; ECF No. 78-4 at 72.  They arrived at medical approximately at 4:00 a.m.  ECF No. 103-4 ¶ 20.  Photographs corroborate Sheppard's head injury.  ECF No. 103-4 at 8.

---

[5] Edwards notes that he directed Balogun to respond to the tier after learning that Aito, Younas and Foxx had been splashed with liquid, ECF No. 104-7 ¶¶ 4–7; *see also* ECF No. 121-5 at 6–9 (documenting Fekoya learned of the liquid assaults at 11:10 p.m.); 133 ¶ 46 (Foxx admitting that he returned to the administrative area and reported to Edwards and Fekoya he had deployed the OC fogger).  But Balogun attests that he did not hear from Edwards until "after the *3:00 a.m. count.*"  ECF No. 104-8 ¶ 3 (emphasis added).

Eventually Sheppard was examined by nurse Carlin Lebreton some time between 6 a.m. and 9 a.m.  ECF No. 103-9 ¶ 3.  The nurse documented that Sheppard had "wounds," but attempts to explain that notation away by later declaration, claiming he learned from Sheppard that the wounds were unrelated to the evening's events.  *Id.* ¶ 5.  Predictably, Lebreton attests to having observed no signs of respiratory distress from either inmate.  *Id.* ¶ 8.  And even though Foxx clearly admitted that the inmates' cell was fogged with spray, Edwards and Fekoya claim that they neither saw or smelled any trace of OC.  *See, e.g.*, ECF Nos. 103-5 ¶¶ 28, 33–34; 103-7 ¶ 11.

Shortly after the incident, on September 24, 2017, Sheppard filed a "Request for Administrative Remedy," (ARP) alleging that he and Holley had been sprayed and fogged with OC, and then were left for hours without any aid or medical attention.  ECF No. 103-11 at 2–3.  DOC referred the matter for a use of force review and investigation.  ECF No. 78-4 at 1–10.  The investigation concluded with sanctions against Foxx only for unreasonable use of force.  *Id.* at 10.

Days after the incident, Edwards charged Sheppard with several inmate rule violations, namely engaging in a disruptive act, committing assault or battery on staff, and interfering with or resisting the performance of staff duties.  ECF Nos. 43-9 at 7; 104-4 ¶¶ 39–40.  He did so after speaking directly with Aito, Younas, and Foxx, reviewing their reports, and watching the video footage.  ECF No. 104-7 ¶¶ 14–15.  Fekoya then delivered to Sheppard notice of the charges against him and of his upcoming disciplinary hearing.  ECF No. 104-4 ¶ 39.

On October 12, 2017, Defendant Hearing Officer Chris Esser presided over a formal disciplinary hearing on Sheppard's charges.  ECF No. 43-9.  In an affidavit, Sheppard attests that

at that hearing "the prison officer" indicated he would be found guilty because he had submitted a grievance regarding his treatment.  ECF No. 121-1 ¶ 12.

After a hearing, Esser found Sheppard guilty of assault and battery on staff and interference with the performance of staff duties.  As punishment, Sheppard received 180 days in disciplinary segregation, diminution of 120 days' good conduct credit, and suspension of visitation for one year.  ECF No. 136-9 at 4–6.  In an affidavit of his own, Esser says he performed as a "fair and impartial fact finder" and made his findings based on photographs of Aito, Younas, and Foxx, reports of the incident, and Sheppard's testimony.  ECF No. 104-12 ¶¶ 9–10.  Sheppard appealed the decision which the Warden affirmed.  ECF No. 43-9 at 9.

Next, Sheppard and Holley separately filed pro se complaints in this Court concerning this incident.  ECF Nos. 1; 4; *Holley v. Foxx*, Dkt. No. 17-cv-3141-PX, ECF No. 1.  The Court consolidated the cases and appointed separate pro bono counsel for each plaintiff.  ECF Nos. 59; 65; 110.  Each, through counsel, amended their individual complaints, and although both men bring certain of the same claims, the claims are not sufficiently identical such that combined treatment is warranted at this stage.  ECF Nos. 77; 130.  This decision focuses on the sufficiency of Sheppard's claims, and the Court will write separately as to Holley.

In his Amended Complaint, Sheppard asserts that Defendants Aito and Foxx violated his Eighth Amendment right to be free from cruel and unusual punishment by repeatedly spraying his cell with OC and deliberately failing to provide him prompt medical attention.  As to Younas, Edwards and Fekoya, Sheppard maintains that each similarly violated his Eighth Amendment rights, but principally because they knew of the OC spray incident and did nothing to prevent the

constitutional violation or provide medical aid.[6]  Sheppard avers that all Defendants filed a "false" rule violation against him and in retaliation for complaining of the incident through the administrative grievance process and that Esser ignored Sheppard's innocence and, absent evidence, found him guilty of two rule violations.  ECF No. 77.

Defendant Foxx has answered the Amended Complaint.  ECF No. 133.  The remaining Defendants moving to dismiss the claims or alternatively for summary judgment to be granted in their favor.  Defendants' arguments collectively raise immunity defenses and separately challenge the legal sufficiency of the allegations, framing the arguments based on the respective role each played.  The Court considers each argument in turn.

## II.     Standard of Review

In their motions, Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) or summary judgment pursuant to Rule 56.  ECF Nos. 43-1, 78-1, 104-1.  Although formal discovery has not commenced, the parties have attached exhibits to their pleadings and urge the Court to consider evidence beyond the four corners of the Amended Complaint.  The Court will do so, however to the extent summary judgment is denied, it will order formal discovery and consider a renewed round of dispositive motions.  For purposes of review, however, these motions are treated as ones brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law.

---

[6] Sheppard had previously pleaded that Younas sprayed OC into the cell along with Foxx.  ECF No. 77 ¶ 37.  In light of video evidence demonstrating that Younas did not deploy OC, Sheppard now argues that Younas is nonetheless liable because he failed to stop Foxx from spraying OC or rendering aid thereafter.  ECF No. 89 at 7.

Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011).

Summary judgment must be granted "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In

responding to a proper motion for summary judgment," the opposing party "must present

evidence of specific facts from which the finder of fact could reasonably find for him or her."

*Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 840 (D. Md. 2004); *Venugopal v. Shire Labs.,

Inc.*, 134 F. App'x 627 (4th Cir. 2005) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252

(1986); *Celotex*, 477 U.S. at 322–23)).

When ruling on a motion for summary judgment, the court may not make credibility

determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir.

2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover,

where the evidence is in conflict on the elements of a claim, summary judgment ordinarily is not

appropriate because the factfinder must resolve material factual disputes, including matters of

witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir.

2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

## III.    Analysis

### A.  Eleventh Amendment Immunity

Defendants first argue that Sheppard cannot maintain suit against them in their official, as

opposed to individual, capacities. ECF Nos. 43-1 at 9–10; 104-1 at 14–15. Defendants are

correct. The Eleventh Amendment to the United States Constitution immunizes state agencies

and departments from citizen suits in federal court, absent narrow exceptions not relevant here.

*See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). It is undisputed that

11

Defendants are Maryland state employees, *see* Md. Code Ann., State Gov't § 12-101(a) (defining "state personnel"), and that suits against agents of the state for acts taken in their official capacities are equivalent to suing the state itself.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted).  Accordingly, the claims against Defendants in their official capacities are barred by the Eleventh Amendment.  *See Pennhurst*, 465 U.S. at 100–01.

Defendants have been sued in their individual capacities as well.  Thus, the Court next addresses the propriety of summary judgment as to each of the claims.

### B.  Eighth Amendment Excessive Force (Count I)

Sheppard alleges that Aito and Foxx each violated his Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to prolonged and unwarranted OC spray multiple times and while he was trapped in his cell.  ECF No. 77 ¶¶ 66.  As to Younas, Edwards and Fekoya, Sheppard alleges that each are likewise liable for knowingly standing by and allowing the other officers to attack him.  *Id.* ¶¶ 65–67; *see* ECF No. 89 at 7.  The Court considers each liability theory separately.

An inmate may bring an Eighth Amendment challenge to a defendant officer's "unnecessary and wanton infliction of pain."  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).  An inmate's Eighth Amendment claim involves a subjective component and an objective component.  "Specifically, Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)."  *Iko v. Shreve*, 535 F. 3d 225, 238 (4th Cir. 2008) (quoting *Williams v.*

*Benjamin*, 77 F.3d 756, 761 (4th Cir.1996)).  As to the objective component, an inmate must

demonstrate that his injury is sufficiently serious to rise above the level of de minimis harm.  *Id.*

at 238 (citing *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992)).  As to the subjective component,

the inmate must show that the officer acted "maliciously and sadistically for the very purpose of

causing harm" rather than "in a good faith effort to maintain or restore discipline."  *Hudson*, 503

U.S. at 6 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21(1986)).  Whether an officer "acted

with wantonness" depends on "(1) the need for the application of force; (2) the relationship

between the need and the amount of force that was used; (3) the extent of any reasonably

perceived threat that the application of force was intended to quell; and (4) any efforts made to

temper the severity of a forceful response."  *Iko*, 535 F.3d at  239 (quoting *Whitley*, 475 U.S. at

321) (internal quotation marks omitted).  With this standard in mind, the Court turns to

Sheppard's claims.

The challenged conduct is Aito's spraying OC repeatedly into Sheppard's cell.  To be

sure, use of pepper spray is not "*per se* a cruel and unusual punishment."  *McCargo v. Mister*,

462 F. Supp. 813, 818 (D. Md. 1978).  Rather, the claim turns on whether the officer chose to

deploy the noxious gas "in quantities greater than necessary or for the sole purpose of infliction

of pain."  *Iko*, 535 F.3d at 240 (quoting *Williams*, 77 F.3d at 763) (emphasis omitted).  *See also*

*McCargo*, 462 F. Supp. at 818;  *cf.*, *Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013)

(finding Eighth Amendment violation where officer discharged can of pepper spray until empty,

and other officer joined in); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (officer's

indiscriminate spraying of tier amounted constitutional violation); *Santiago v. Walls*, 599 F.3d

749, 757 (7th Cir. 2010) (determining that Eighth Amendment was not violated where pepper

spray was used to break up inmate fight); *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002) (holding use of pepper spray during prison riot appropriate).

Aito contends that summary judgment must be granted in his favor because he only attempted to use OC spray in response to Holley's "assault" on him. ECF No. 78-1 at 7–9. When viewing the record most favorably to Sheppard, the Court cannot agree. To be sure, video surveillance footage corroborates that Holley swatted at Aito, and that Aito appears to have been splashed with a liquid of some sort. Aito responds by repeatedly deploying pepper spray into a closed, confined cell, and then *walking away*. Aito does not attempt to secure the inmates or bring them into any other compliance. ECF No. 78-2 ¶¶ 6–7. Nor does the record support that Aito was in fact confronted with any such danger warranting an OC deployment. He was clearly free to deploy his pepper spray repeatedly directly into Sheppard's cell. ECF No. 43-2 at 22:48:11–48:27; *see also* ECF Nos. 121-6 at 2–3; 121-1 ¶ 4. And while Aito now claims his spray cannister malfunctioned, the record belies that contention. More to the point, Sheppard attests to having been sprayed by Aito. The video footage corroborates that attestation. And thus, it will be up to the trier of fact to judge whether Aito offers a credible explanation for his conduct, *see Courtney-Pope v. Bd. of Educ. of Carroll Cnty.*, 304 F. Supp. 3d 480, 489 (D. Md. 2018), or whether he deployed OC into the cell "for the sole purpose of infliction of pain." *See Iko,* 535 F.3d at 240.

As to the remaining factors relevant to this inquiry, sufficient evidence exists to allow the claim against Aito to proceed. Although OC spray may be a "commonly used method" of incapacitating unruly inmates so that officers may "cuff them up," *Iko*, 535 F.3d at 239, a reasonable factfinder could conclude these men were sprayed with no such purpose. Rather, they were left to suffer the effects of the gas for nearly four hours.

Likewise, the record reflects that no efforts were made to "temper" the effects of the spray on them.  None of the Defendant officers, including Aito, performed a welfare check, attempted to remove the inmates from the contaminated cell, rendered aid or called for medical assistance.  *Iko*, 535 F.3d at 240.  Indeed, the record reflects that the noxious effects of the spray overwhelmed Holley and Sheppard to the point that they both passed out and had to be treated for injuries associated with having lost consciousness.  With no efforts to "temper the severity" of the OC deployments, *id.*, a reasonable factfinder could conclude that the choice to spray into the cell was sufficiently malicious and wanton so as to support an Eighth Amendment excessive force claim.  Thus, summary judgment is denied as to Aito.

Officer Younas presents a more difficult consideration.  Although Younas clearly did not deploy OC spray, he may be held to account where he knows that (1) "a fellow officer is violating an individual's constitutional rights; (2) [he] has a reasonable opportunity to prevent the harm; and (3) chooses not to act."  *Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002).  In this respect, the relevant conduct focuses on Younas' partner, Foxx.  Younas can be seen walking with Foxx on the video to perform the count.  Younas also can be seen communicating to Foxx that he had been hit with some liquid as he approached the cell.  Shortly after, Foxx bent down and deliberately deployed the OC fogger into the cell.  Indeed, by Foxx's own account, the decision to use OC at that moment was impulsive and not otherwise justified. ECF No. 78-4 at 44.  And yet neither Foxx nor his partner Younas returned to the cell to check on Sheppard's welfare.  On this record, the Court will not grant summary judgment as to Younas.  Rather, discovery is necessary to ascertain fully Younas' knowledge and role in Foxx's gratuitous use of the OC fogger on Sheppard and Holley and in the subsequent delay in rendering care.

As to Edwards and Fekoya, however, the Court must grant summary judgment in their favor.  At best, the liability as to them is limited to a bystander theory alone.  But even when viewing the record evidence most favorably to the Sheppard, nothing supports that either knew that Aito or Foxx had deployed OC spray into the cell until well after the incident.  ECF Nos. 78-4 at 44; 103-5 ¶¶ 6, 9, 33–35; 103-7 ¶¶ 11–12.  Nor can Sheppard pursue the claims, brought pursuant to 42 U.S.C. § 1983, under a *respondeat superior* or supervisory theory of liability.  *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no *respondeat superior* liability under § 1983); *Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994) (supervisory liability requires that supervisors "had actual or constructive knowledge" of subordinates' conduct).  Thus, summary judgment is granted on the Eighth Amendment excessive force claim as to them.

### C.  Eighth Amendment Deliberate Indifference to a Serious Medical Need (Count II)

Next, the Court turns to Sheppard's related claim that the officers demonstrated deliberate indifference to his serious medical needs after having OC sprayed him.  ECF No. 77 ¶¶ 72–78.  Like his excessive force claim, for an Eighth Amendment denial of medical care claim "there is a subjective and an objective component to showing a violation of the right.  The plaintiff must demonstrate that the officers acted with "'deliberate indifference' (subjective) to the inmate's 'serious medical needs' (objective)."  *Iko*, 535 F.3d at 241 (quoting *Estelle*, 429 U.S. at 104).

The objective component, a "serious . . . medical need," is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).  *See also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  As to the subjective prong, the inmate must show that the prison official knew

16

about and disregarded the "excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1970).

Defendants vigorously contend that no evidence reflects Sheppard had any need for medical attention, and certainly not a "serious" medical need. ECF Nos. 43-1 at 14–15; 78-1 at 16–18; 104-1 at 16–19. While the Court agrees that certain correctional officers describe Sheppard as "laughing" and "yelling" after he supposedly had been OC sprayed, contrary evidence paints a very different picture. Sheppard and Holley, both asthmatic, attest to having choked on OC spray to the point that they passed out. ECF Nos. 121-1 ¶¶ 4, 6; 157-1 ¶¶ 5–6. Consistent with losing consciousness, Sheppard appears to have hit his head. ECF Nos. 121-1 ¶ 7; 103-4 at 8. As further corroboration that both men were felled by the OC spray, Holley had to be transported to medical in a wheelchair. ECF Nos. 103-4 ¶ 16; 78-4 at 72.

As to the subjective prong, all officers are trained to respond to the deleterious health effects of using OC spray. Aito acknowledges, in fact, that officers must "immediately evaluate any inmate impacted by the pepper spray" and "take the inmate to medical treatment to be evaluated by a member of the medical staff" precisely because the noxious gas can do serious harm. ECF No. 78-2 ¶ 3 (OC fogger "should be expected to cause serious damage or death."). Accordingly, substantial evidence exists that Sheppard was suffering from an obvious need for medical attention after he had been sprayed. *See Iko*, 535 F.3d at 241 (use of pepper spray exposed plaintiff to a substantial risk of serious harm).

Moreover, although each Defendant denies *ever* knowing that Sheppard needed medical care, the four-hour delay in attending to the inmates warrants further evidentiary exploration. Aito and Foxx actually discussed that Foxx had unleashed the OC fogger into the cell—which alone renders shocking their subsequent lack of attention. ECF No. 78-2 ¶ 9. As for Younas,

Edwards, and Fekoya, each claim to have been acutely aware of the "liquid assaults" that Holley evidently visited on the officers.  Yet each also professes remarkable ignorance as to the officers having shot OC into the enclosed cell.  Nor do the Defendants explain with any satisfaction the absence video footage for those four hours, or their choice *not* to attempt to extract the inmates from the cell at any point.  Sheppard is thus entitled to explore the extent to which Defendants were aware that he had been sprayed in his cell with OC and left for hours with no medical attention whatsoever.  Summary judgment on this claim is thus denied.

### D.  Retaliation (Count III)

Sheppard also claims that Defendants retaliated against him for exercising his First Amendment right to petition the DOC for redress of his grievances.  ECF No. 77 ¶¶ 79–90. To pursue a successful retaliation claim based on a prisoner's exercising his First Amendment right to "petition for redress of grievances," a plaintiff must prove that (1) he engaged in protected activity, here the right under the Petitions clause of the First Amendment; (2) defendants took some action that adversely affected the exercise of such activity; and (3) a causal relationship between the plaintiff's activity and the defendant's conduct.  *See Booker v. S. Carolina Dep't of Corrections*, 855 F.3d 533, 537 (4th Cir. 2017).  Where prison officials' retaliatory conduct would "deter [a] prisoner of ordinary firmness" from pursuing his grievance, then the inmate has successfully pleaded a retaliation claim.  *Id.  See also Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005)).

Viewing the record most favorably to Sheppard, the claim survives challenge.  First, Sheppard clearly engaged in protected activity in filing an administrative grievance based on the same allegations of excessive force and denial of medical care that he pursues here.  ECF No.

103-11 at 2–3.  Second, record evidence demonstrates that immediately after he made his grievances known, Defendants collectively participated in filing several inmate rule violations against him for assault, engaging in a disruptive act, and interference with a performance of correctional staff duties.  ECF Nos. 104-7 ¶ 15; 121-1 ¶ 12.  Yet at least *one* version of Aito's recounted events demonstrates that Sheppard had committed no such violations; Aito stated that Sheppard had been standing in the back of the cell, hands in front of him, calmly urging the officer to "stop his nonsense."  Sheppard likewise attests that he had committed no such violations.  ECF No. 121-1 ¶¶ 11–12.  That the record supports Sheppard's innocence is critical to the analysis because it is precisely the act of filing false charges against an inmate that could result in severe sanction which deters one of ordinary firmness from filing a grievance in the first place.

In response, Defendants press that summary judgment must be granted in their favor because they played "no role" in the disciplinary proceedings.  ECF Nos. 43-1 at 17–19; 78-1 at 17; 104-1 at 22.  The record demonstrates otherwise.  Edwards attests that prior to bringing charges against Sheppard, he had thoroughly reviewed the reports and record evidence provided by the other involved correctional officers and communicated with each directly as to their experience.  ECF No. 104-7 ¶ 15.  Sheppard also attests that at his hearing "the prison officer," told him he would be found guilty because he had spoken out about his treatment and submitted complaints regarding the OC spray incident.  ECF No. 121-1 ¶ 12.  Accordingly, whether and to what extent Defendants worked in concert to chill Sheppard's right to complain about Defendants' malfeasance remains fruitful ground for exploration during discovery.  The Court cannot grant Defendants' motion for summary judgment at this stage.

### E.  Qualified Immunity

Lastly, the Court addresses Defendants' broad request for "qualified immunity" as to the Eighth Amendment and retaliation claims.  ECF Nos. 43-1 at 19–22; 78-1 at 18–21; 104-1 at 28–29.  Under the doctrine of qualified immunity, a state actor may be shielded from liability where his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  So even where a constitutional injury is proven, a defendant may still avoid liability if the constitutional right was not "clearly established" at the time defendant is said to have engaged in the wrongdoing.  *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  But if the constitutional right was sufficiently clear such that an objectively reasonable officer in a defendant's position would have understood his conduct to have violated the right, qualified immunity does not apply.  *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Court concludes that on the current record viewed most favorably to Sheppard, qualified immunity does not bar the claims at this stage.  First, the rights at issue are all well-defined and clearly established.  Sheppard enjoys the constitutional right to be free from excessive use of OC spray, *see Iko,* 535 F.3d at 240, the right to receive prompt and adequate medical attention to treat the serious health effects of the OC spray*, see id.* at 243; *Scinto*, 841 F.3d at 236, and the right to petition for redress of grievances, *Booker*, 855 F.3d at 545.

Second, the factual discrepancies as to the incident and its aftermath preclude a finding that Defendants did not violate Sheppard's rights.  For example, record evidence permits a reasonable factfinder to conclude that Foxx and Aito deployed OC spray in Sheppard's cell, a close and confined space with no room for escape and for no justifiable reason.  Likewise, record

evidence demonstrates that Sheppard and Holley were left for hours to suffer the deleterious effects of the OC spray, thus supporting the unwarranted and deliberate delay of attending to their serious medical needs.  Lastly, it cannot go unnoticed that Sheppard faced inmate rule violations only after he lodged his complaints about being sprayed with OC as a mere "innocent bystander."  ECF No. 77 ¶¶ 80.  In short, the case requires further factual development before the defense of qualified immunity may be assessed in proper context.  At the conclusion of formal discovery, Defendants are free to revisit the propriety of the qualified immunity defense as to some or all of the claims.

### F.   Motion for Leave to File a Surreply

In response to purportedly new arguments and evidence filed in Defendants Edwards, Esser, and Fekoya's Reply, Sheppard seeks leave to file a surreply.  ECF No. 140.  Surreplies are disfavored in this District, but the Court may permit a party to file a surreply "when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply."  *Khoury v. Meserve,* 268 F.Supp.2d 600, 605 (D. Md. 2003).  Although the Court frowns on the Defendants' having raised new arguments in the reply with nine new exhibits in support, none alter the Court's determinations.  Accordingly, the motion for leave to file a surreply is denied.

## IV.   Conclusion

For the foregoing reasons, the motions to dismiss, or in the alternative for summary judgment, are granted as to Count I as to Defendants Younas, Edwards, and Fekoya, (ECF No. 76, 104), to all claims brought against Defendants in their official capacities, and denied in all other respects.

A separate order follows.

_____8/18/21_____         _____/s/_____
Date                             Paula Xinis
                                 United States District Judge