## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GRANT HOLLEY,

      Plaintiff,

  v.

KEVIN FOXX, *et al.*,

      Defendants.

           \*

           \*

           \*

           \*

           \*

Civil Action No. 8:17-cv-3141-PX
(consolidated with 17-cv-3140)

        \*\*\*

## MEMORANDUM OPINION

Pending in this prisoner civil rights action are motions to dismiss, or in the alternative, for summary judgment filed by Defendants Martins Aito, Farhan Younas, Elwyn Edwards II, Samson Balogun, Foluso Fekoya, Kevin Hight, Ndukwe Onuma, Woody Paul, and Adebowale Lawal.  ECF Nos. 144, 149.  The motions have been fully briefed and no hearing is necessary. *See* Loc. R. 105.6.  For the following reasons, the Court grants in part and denies in part the motions for summary judgment.

### I.    Background[1]

Maryland Department of Safety and Correctional Services ("DOC") correctional officers are charged with maintaining safety and security in Maryland's prisons.  This responsibility includes quelling disturbances that crop up in prison settings.  To perform their jobs adequately, officers are trained that they may use force when necessary to restore discipline or bring an inmate under control.  ECF No. 78-2 ¶ 3.[2]  *See Whitley v. Albers*, 475 U.S. 312, 320–21 (1986).

---

[1] Holley asserts that because Defendants failed to provide a statement of undisputed facts, the Court must dismiss their motions for summary judgment.  ECF No. 157 at 20 (citing Federal Rule of Civil Procedure 56(c)).  The Court rejects this invitation.  The Court's Local Rules do not require that movants structure their account of "undisputed" facts in any particular format, and for good reason.  This Court often finds that one party's views of the "undisputed" facts are rarely accurate or complete, and thus are largely unhelpful.

[2] Citations to record evidence at times refer to exhibits previously filed with this Court.  *See* ECF No. 149 at 2 n. 2.  Also, Defendants have submitted identical declarations and other records in multiple motions.  For ease of reference and continuity in the common facts pertinent to Holley and Sheppard, the Court cites to the ECF numbers

To aid them in this necessary and sometimes very dangerous function, correctional officers are given an array of tools, such as handcuffs, batons, and protective gear. One such device is oleoresin capsicum ("OC") spray, colloquially known as "pepper spray." ECF No. 78-2 ¶ 3. DOC officers are issued both a small canister of OC spray and a larger fogger-style spray. *Id.* Officers understand that the "fogger" presents greater risk to inmates and "should be expected to cause serious damage or death." *Id.* Whenever OC spray is deployed on an inmate, officers are expected to render timely medical aid when they may safely do so. *Id.* Once sprayed, an inmate is to be evaluated and treated at the prison medical unit or, if necessary, correctional officers must provide immediate first aid and seek prompt medical assistance. *Id.* ¶¶ 2–3; *see* ECF No. 121-7 at p. 1.[3]

On the evening of September 23, 2017, DOC inmates, Bryan Sheppard and Grant Holley, were housed as cellmates in the disciplinary or "segregation" tier at Jessup Correctional Institution ("JCI"). ECF Nos. 157-1 ¶ 3; 78-2 ¶ 4. Earlier that evening, inmates on that tier had been throwing refuse and other items from their cells onto the hallway. *See* ECF Nos. 78-2 ¶ 4; 103-4 ¶ 6. No evidence reflects that Holley or Sheppard had been throwing such items. Nor is there any evidence that any officers had been injured as a result.

Around 10:45 p.m., correctional officers began "the count," a process whereby they confirm that all prisoners are in their assigned cells. In the segregation tier, a correctional officer walks the hallway and peers into the cell through a window without opening the cell door. ECF No. 78-2 ¶ 4. At about 10:47 p.m., Defendant Correctional Officer II, Martins Aito ("Aito")

---

for the declarations and record evidence attached to the dispositive motions filed in *Sheppard v. Foxx*, PX-17-3140 (consolidated with PX-17-3141). Where the evidence diverges or is considered solely as to Holley, the Court cites to record evidence filed in 17-3141.

    [3] The Court takes judicial notice of the training materials, posted on the DOC website. *Police Training and Standards Commission: Use of Force Best Practices (Standards & Training)*, Maryland.gov, (last visited August 16, 2021)*; United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (explaining that courts "routinely take judicial notice of information contained on state and federal government websites.") (citing cases).

approached Sheppard and Holley's cell.  At that time, and as corroborated by video surveillance footage, Holley's arm was hanging out of the door's feed slot.  *Id.* ¶ 5; ECF No. 43-2 at 22:47:17.4.  Aito also attests that the cell window was blocked so he could not see inside.  ECF No. 78-2 ¶ 5.

As Aito approached the inmates' cell window, he asked to see Sheppard; but according to the officer, Holley declined to move.  ECF No. 78-2 ¶ 5.  Video footage captures what appears to be Aito talking into the feed slot at which point Holley appears to swipe at the papers in Aito's hand.  *Id.*; ECF No. 43-2 at 22:47:50–48:00.  Holley and Aito next can be seen swatting at each other, and Aito appears to move toward the feet slot.  ECF No. 43-2 at 22:47:58–48:02.  At the same time, liquid is splashed through the feed slot, which Aito believes was feces and bleach.  ECF No. 78-2 ¶¶ 5, 6.  The cell door remained closed and locked, and so Aito was free to move away from the door without any further interaction.

And yet, Aito next appears to spray his OC canister into the feed slot several times in rapid succession.  ECF No. 43-2 at 22:48:11–48:27.  In between each use of the canister, it appears as if liquid was thrown toward Aito through the slot.  After spraying three or four shots of OC into the cell, Aito can be seen leaving the tier abruptly.  *Id.* at 22:48:27–48:40.  No other officer followed behind Aito to check on the inmates following Aito's use of his OC spray cannister.

Aito headed directly to the control center to return his equipment, including the OC spray canister, but he never reported that he had used it *or* that it had supposedly malfunctioned.  ECF No. 78-2 ¶ 8.  Aito next documented the occurrence in a handwritten "matter of record." [4]  ECF

---

[4] Aito also claims that he was also seen at Baltimore-Washington Medical Center for the injuries to his hand and was relieved of his duties for nearly a month, yet no records corroborate these claims, and other internal DOC reports affirmatively state that Aito suffered no injuries.  *Compare* ECF No. 78-2 ¶ 10 *with* ECF Nos. 136-3 at

No. 121-5 at 41.  This statement, written contemporaneously with the incident, contradicts the video footage in meaningful ways.  Aito wrote that Holley had "grabbed" and "squeezed" Aito's wrist which caused Aito to "close" the feed slot.  *Id*.  Aito further describes how "Inmate Grant then held the slot to my 2nd and index finger, thereby hurting my right wrist and fingers" and "as [Aito] bent down in excruciating pain, over the excruciating pain, inmate Grant Holley then assaulted [him] with an unknown substance of feces and bleach liquid."  *Id*.  But the video shows no grabbing or twisting of Aito's wrist, or his bending down in "excruciating pain."  Lastly, and contrary to the video, Aito makes no mention of deploying his OC cannister.

In connection with this case, Aito also submitted a separate sworn declaration which diverges from his first written statement in important ways.  Although Aito in his declaration now admits to using his OC cannister, he claims he only did so once, but that the OC canister "did not work as intended . . . [or] depress properly."  ECF No. 78-2 ¶ 6.  Aito also attests that after he attempted to spray, he could see Sheppard through the feed slot standing up in the back of the cell with his hands in front, saying to Aito "[y]ou need to stop this nonsense."  *Id.* ¶ 7.  But this detail was wholly missing from his first statement and does not jibe with the events depicted on the video.

After Aito left the tier, Defendant Sergeant Foluso Fekoya ("Fekoya"), the Officer in Charge, directed Defendants Correctional Officers II Farhan Younas ("Younas") and Kevin Foxx ("Foxx") to continue the count.  ECF No. 43-5 ¶ 4.  Younas and Foxx arrived on the wing around 11:00 p.m.  *See* ECF No. 43-2 at 22:59:40–23:02:00.  On the video footage, Younas can be seen walking up to and then past Sheppard and Holley's cell without stopping to look through the cell window.  *Id.* at 23:02:27–02:30.  The video also appears to capture Younas moving

---

6 ("COII Aito advised that he wasn't injured"); 136-5 at 4 (internal investigative report noting that "[t]here were no [staff] injuries.").

slightly out of the way as to avoid coming into contact with what appears to be liquid.  The video quality is less than ideal, so it is difficult to see whether Younas was attempting to avoid liquid on the floor or liquid thrown in his direction.

Younas, too, submits detailed sworn declarations.  At length, he describes the difficulties presented for officers to be able to see into an inmate's cell, given the size, shape, and positioning of the cell window and lighting.  Younas also makes clear that he could not see into the cell and so he never verified their presence.  ECF No. 103-2 ¶¶ 3–13.  The video also depicts that Younas immediately left the tier without finishing the count.  *Id.* ¶ 15; ECF No. 43-2 at 23:02:37.  Younas also claims that during his shift he was completely unaware of any use of OC spray.  ECF No. 149-7 ¶¶ 4–5.

A few minutes later, Foxx approached the cell to continue the count.  Video footage shows that Foxx also seemingly reacted to what he attests is liquid thrown from Holley and Sheppard's cell.  ECF No. 43-2 at 23:07:45–07:49.  But again, the video footage is not clear enough to show whether Foxx reacted to liquid already on the hallway floor or coming from the cell.  What is clear, however, is that Foxx immediately removed his OC fogger, bent down, shot OC through the gap at the bottom of the closed cell door, and quickly walked away.  *See* ECF No. 43-2 at 23:07:45–07:55; *see also* ECF No. 78-4 at 44.  Like Aito, Foxx did nothing to check on either inmate after using the OC spray.  In a written statement provided that evening, Foxx candidly admits that he used the OC fogger "as an impulsive initial reaction" and essentially without justification.  ECF No. 78-4 at 44.

Younas and Foxx reported to Fekoya about the liquid thrown at them.  In Foxx's written report and Answer, Foxx admits that he also notified Fekoya and Defendant Captain Elwyn Edwards II ("Edwards") of his having used the OC fogger in the cell.  ECF No. 133 ¶ 46; *see*

5

*also* ECF No. 78-4 at 44 (Foxx explaining that he "notified [his] building sergeant of the incident."). Aito corroborates that Foxx returned to the administrative building after his count and stated that he (Foxx) had deployed his OC fogger. ECF No. 78-2 ¶ 9. In contrast, Fekoya attests that Foxx did not mention anything to him about deploying OC spray. ECF No. 103-5 ¶ 7.

Fekoya, in turn, reported the incident to his commanding officer, Edwards, who, as relayed by Lieutenant Kevin Hight ("Hight"), directed Fekoya to put a shield in front of Holley and Sheppard's cell. ECF Nos. 103-5 ¶ 8; 149-5 ¶ 6. The shield is used to protect officers from being hit by liquid or other projectiles thrown from a cell, but still permits them to see inside the cell window. Fekoya also recalls Hight telling him that no officer should be on the tier after placement of the shield, as corroborated by an entry in the building's logbook. ECF Nos. 149-6 ¶ 13; 43-7 at 11. Hight, however, says he only warned Fekoya to exercise caution on the wing, and assumed officers would continue to conduct rounds and keep a presence on the tier. ECF No.149-5 ¶ 7.

Video footage shows Fekoya placing the shield in front of the cell at 11:17 p.m. and he then remained on the tier to keep watch. ECF Nos. 43-2 at 23:16:20–18:24; 149-6 ¶ 15. In his sworn declaration, Fekoya maintains that he too could not see into the cell, but somehow knew the cell door was "barricaded." Fekoya describes the men as "yelling and laughing" with no apparent injuries. *See* ECF No. 103-5 ¶¶ 9–15. At around 1:20 a.m., Defendant Correctional Officer II Adebowale Lawal ("Lawal") was informed about the "liquid assaults" and reassigned to the wing to replace Aito, Foxx, and Younas and help conduct counts, including one performed around 3:14 a.m. ECF Nos. 43-7 at 11–12; 149-8 ¶¶ 5–8. Lawal attests specifically that neither Sheppard or Holley tried to "talk to him" or "get his attention," but he does not disclose whether

6

he saw the men in their cells when he performed the count.  ECF No. 149-8 ¶ 5.  And although Lawal states he "did not observe any sign spray had been used on the tier," he mentions nothing about whether he could observe any signs of pepper spray in the cell.  *Id.*

Fekoya and Defendant Correctional Officer II Woody Paul ("Paul") also conducted a count at 2:50 a.m.  ECF Nos. 43-7 at 12; 149-6 ¶ 15.  Fekoya attests that neither Holley nor Sheppard "could be properly seen" during the count, although he fails to elaborate why that was the case.  ECF No 149-6 ¶ 15.  Indeed, not one officer describes seeing, smelling or otherwise observing any evidence that pepper spray had been deployed into Sheppard and Holley's cell.

Regarding these events, the inmates describe them very differently.  Holley recounts that Aito approached the cell and began swearing at him and yelling for him to get away from the door.  ECF No. 157-2 at 3.  He and Aito began to argue and then Aito sprayed OC into the cell through the feed slot.  *Id.*; ECF No. 157-1 ¶¶ 5.  Because both Sheppard and Holley have asthma, they immediately had difficulty breathing.  ECF Nos. 104-14 at 41; 149-13 at 4.  The spray burned their eyes, noses, and throats and they began to pound on the door for help.  ECF Nos. 121-1 ¶ 4; 157-1 ¶ 5.

Then, after Foxx fogged the cell, both men lost consciousness.  ECF Nos. 121-1 ¶¶ 6 –7; 157-1 ¶ 8.  Sheppard eventually regained consciousness and saw Holley lying in his own urine.  ECF No. 121-1 ¶ 8.  Sheppard next pounded on the door and yelled for medical help until Defendant Major Samson Balogun, accompanied by Defendant Correctional Officer II Ndukwe Onuma ("Onuma"), arrived.  *Id.* ¶ 9; ECF No. 121-6 at p. 3; *see also* ECF Nos. 103-4 ¶ 6, 8; 149-12.  Holley recalls regaining consciousness as a nurse was physically shaking him.  ECF No. 157-1 ¶ 9.

Although Holley does not make clear how long he and Sheppard remained in the cell before Balogun arrived, Balogun attests that it was after 3:00 a.m. before he and Onuma were directed to the tier.[5]  ECF No. 103-4 ¶ 3.  Even more troubling, for the nearly four hours between Foxx using the OC fogger and Balogun and Onuma reporting to the cell, there is no surveillance footage and no coherent explanation for why the footage had not been kept pending resolution of an extensive internal investigation on the officers' conduct that night.  *Cf.* ECF No. 160-7 (attesting to 45-day window to burn video).  Nor do Defendants clearly document their whereabouts or explain with any cogency why they did not even try to remove the men from their cells.  *Compare* ECF No. 103-7 ¶ 9 (Edwards attesting that because the men had barricaded themselves in and were interacting with officers he saw "no need for a forced extraction"); *with* ECF No. 103-5 ¶ 16 (Fekoya explaining that cell extraction deemed "impossible" because the tier was "short staffed").

When Balogun finally entered the cell, he observed Sheppard with a knot on his head, ECF No. 103-4 ¶ 17, and he found Holley lying on the floor "disoriented."  *Id.* ¶ 13; *see also* 103-5 ¶ 28 (Fekoya explaining "Inmate Holley appeared to be disoriented").  Both men were taken to the medical unit, Holley by wheelchair.  ECF Nos. 103-4 ¶ 16; 78-4 at 72.  They arrived at medical approximately at 4:00 a.m.  ECF No. 103-4 ¶ 20.[6]

Eventually Holley was examined by nurse Carlin Lebreton some time between 6 a.m. and 9 a.m.  ECF No. 149-11 ¶ 2.  Predictably, Lebreton attests to having observed no signs of

---

[5] Edwards notes that he directed Balogun to respond to the tier after learning that Aito, Younas and Foxx had been splashed with liquid, ECF No. 104-7 ¶¶ 4–7; *see also* ECF No. 121-5 at 7 (documenting Edwards learned of the liquid assaults at 11:10 p.m.).  But Balogun attests that he did not hear from Edwards until "after the **3:00 a.m.** count."  ECF No. 104-8 ¶ 3 (emphasis added).  Similarly, Hight claims that he learned that officers had been assaulted soon after the incidents, but no one notified him that OC spray had been deployed.  ECF No. 149-5 ¶ 4.  By his account, he did not learn of the use of OC spray until later the next day.  *Id.* ¶ 9.

[6] Even though Onuma accompanied Balogun to the cell, Onuma has no recollection of the events from that morning.  ECF No. 149-12.

respiratory distress from either inmate or any evidence of incontinence from Holley.  *Id.* ¶ 4.

And even though Foxx clearly admitted that the inmates' cell was fogged with spray, Edwards,

Fekoya, Lawal, Balogun, and Paul claim that they neither saw nor smelled any trace of OC.  *See,*

*e.g.*, ECF Nos. 103-5 ¶¶ 28, 33–34; 103-7 ¶ 11; 149-8 ¶ 5; 149-9 ¶ 11; 149-10 ¶¶ 5–6, 9.

Shortly after the incident, on September 24, 2017, Holley filed a "Request for

Administrative Remedy," (ARP) in which he complained that after he and Sheppard had been

sprayed and fogged with OC, they were left for hours without any aid or medical attention.  ECF

No. 157-2 at 2–3.  DOC referred the matter for a use of force review and internal investigation.

ECF No. 78-4 at 1–10.  The internal investigation concluded with sanctions against Foxx only

for unreasonable use of force.  *Id.* at 10.

Holley's ARP was dismissed on October 13, 2017, on the grounds that JCI's internal

investigative unit had already begun an investigation and "[a]s such no further action [would] be

taken by [JCI] regarding [the] complaint."  ECF No. 157-3.  Holley attests that he appealed the

dismissal on October 20, but never heard anything regarding the status of his appeal or any other

available remedies.  ECF Nos. 157-4; 157-1 ¶¶ 13–16.  Defendants claim that no records of the

appeal exist.  ECF No. 149-16 ¶ 2 ("A search of the available records did not produce any record

of . . . an ARP appeal from Grant Holley . . .").

Next, Sheppard and Holley separately filed pro se complaints in this Court concerning

this incident.  *See Sheppard v. Aito*, Dkt. No. 1:17-cv-3140-PX.  The Court consolidated the

cases and appointed separate pro bono counsel for each plaintiff.  ECF Nos. 59; 65; 110.  Each,

through counsel, amended their individual complaints, and although both men bring certain of

the same claims, the claims are not sufficiently identical such that combined treatment is

warranted at this stage.  ECF Nos. 77; 130.  This decision focuses on the sufficiency of Holley's claims and the Court will write separately as to Sheppard.

In his Amended Complaint, Holley asserts that Defendants Aito and Foxx violated his Eighth Amendment right to be free from cruel and unusual punishment by repeatedly spraying his cell with OC and deliberately failing to provide him prompt medical attention.  Holley also maintains that Aito, Foxx, Younas, Fekoya, Edwards, Balogun, and Hight each similarly violated his Eighth Amendment rights because they knew of the OC spray incident and did nothing to intervene or prevent the constitutional violation.  Holley also avers that all Defendants failed to provide him or facilitate medical aid.  ECF No. 130.

Defendant Foxx has answered Sheppard's Amended Complaint and had previously answered Holley's initial Complaint but has not answered Holley's Amended Complaint.  *See* ECF No. 133 (Answer to Sheppard's Amended Complaint).  The remaining Defendants move to dismiss the claims or alternatively for summary judgment to be granted in their favor. Defendants' arguments collectively raise immunity defenses and separately challenge the legal sufficiency of the allegations, framing the arguments based on the respective role each played. The Court considers each argument in turn.

## II.   Standard of Review

In their motions, Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) or summary judgment pursuant to Rule 56.  ECF Nos. 144-1, 149-2.  Although formal discovery has not commenced, the parties have attached exhibits to their pleadings and urge the Court to consider evidence beyond the four corners of the Amended Complaint.  The Court will do so, however to the extent summary judgment is denied, it will order formal discovery and

consider a renewed round of dispositive motions.  For purposes of review, however, these motions are treated as ones brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In responding to a proper motion for summary judgment," the opposing party "must present evidence of specific facts from which the finder of fact could reasonably find for him or her." *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 840 (D. Md. 2004); *Venugopal v. Shire Labs., Inc.*, 134 F. App'x 627 (4th Cir. 2005) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986); *Celotex*, 477 U.S. at 322–23)).

When ruling on a motion for summary judgment, the court may not make credibility determinations.  *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Moreover, where the evidence is in conflict on the elements of a claim, summary judgment ordinarily is not appropriate because the factfinder must resolve material factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

III.   **Analysis**

A.  **Eleventh Amendment Immunity**

Defendants argue that Holley cannot maintain suit against them in their official, as opposed to individual, capacities.  ECF No. 149-2 at 34–35.  Defendants are correct.  The Eleventh Amendment to the United States Constitution immunizes state agencies and departments from citizen suits for damages in federal court.  *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  It is undisputed that Defendants are Maryland state employees, *see* Md. Code Ann., State Gov't § 12-101(a) (defining "state personnel"), and that suits against agents of the state for acts taken in their official capacities are equivalent to suing the state itself.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  Accordingly, the claims against Defendants in their official capacities are barred by the Eleventh Amendment.  *See Pennhurst*, 465 U.S. at 100–01.[7]

Defendants have been sued in their individual capacities as well.  Thus, the Court next addresses the propriety of summary judgment as to each of the claims.

B.  **Eighth Amendment Excessive Force and Failure to Protect (Counts I and II)**

Holley alleges that Aito and Foxx each violated his Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to prolonged and unwarranted OC spray multiple times and while he was trapped in his cell.  ECF No. 130 ¶¶ 162–68.  As to Younas, Fekoya, Edwards, Balogun, and Hight, Holley alleges that each are likewise liable for knowingly

---

[7] The Eleventh Amendment does not, however, bar suits seeking prospective injunctive relief.  *Bland v. Roberts*, 730 F.3d 368, 390 (4th Cir. 2013), *as amended* (Sept. 23, 2013).  Holley seeks an order enjoining Defendants from further violating the Eighth Amendment and from retaliating against him.  ECF No. 130 at p. 23.  Even if Holley may bring such challenges against Defendants in their official capacities, his claims for injunctive relief are moot because he is no longer incarcerated at JCI.  ECF No. 157-1 ¶ 1.  *See Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir. 2007); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (transfer rendered moot a prisoner's claims for injunctive and declaratory relief, but not claims for damages); *Taylor v. Rogers*, 781 F.2d 1047, 1048 n. 1 (4th Cir. 1986) (same).

standing by and allowing the other officers to attack him.  *Id.* ¶¶ 169–78.  The Court considers each liability theory separately.

An inmate may bring an Eighth Amendment challenge to a defendant officer's "unnecessary and wanton infliction of pain."  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).  An inmate's Eighth Amendment claim involves a subjective component and an objective component.  "Specifically, Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)."  *Iko v. Shreve*, 535 F. 3d 225, 238 (4th Cir. 2008) (*quoting Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)).  As to the objective component, an inmate must demonstrate his injury is sufficiently serious to rise above the level of *de minimis* harm.  *Id.* at 238 (citing *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992)).  As to the subjective component, the inmate must show that the officer acted "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline."  *Hudson*, 503 U.S. at 6 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).  Whether an officer "acted with wantonness" depends on "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response."  *Iko*, 535 F.3d at  239 (quoting *Whitley*, 475 U.S. at 321) (internal quotation marks omitted).  With this standard in mind, the Court turns to Holley's claims.

The challenged conduct is Aito's spraying OC repeatedly into Holley's cell.  To be sure, use of pepper spray is not "*per se* a cruel and unusual punishment."  *McCargo v. Mister*, 462 F. Supp. 813, 818 (D. Md. 1978).  Rather, the claim turns on whether the officer chose to deploy the noxious gas "in quantities greater than necessary or for the sole purpose of infliction of pain," *Iko*, 535 F.3d at 240 (quoting *Williams*, 77 F.3d at 763) (emphasis omitted).  *See also McCargo*, 462 F. Supp. at 818; *cf.*, *Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013) (finding Eighth Amendment violation where officer discharged can of pepper spray until empty, and other officer joined in); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (officer's indiscriminate spraying of tier amounted constitutional violation); *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010) (determining that Eighth Amendment was not violated where pepper spray was used to break up inmate fight); *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002) (holding use of pepper spray during prison riot appropriate).

Aito contends that summary judgment must be granted in his favor because he only attempted to use OC spray in response to Holley's "assault" on him.  ECF No. 144-1 at 10–11.  When viewing the record most favorably to Holley, the Court cannot agree.  To be sure, video surveillance footage corroborates that Holley swatted at Aito, and that Aito appears to have been splashed with a liquid of some sort.  Aito responds by repeatedly deploying pepper spray into a closed, confined cell, and then *walking away*.  Aito does not attempt to secure the inmates or bring them into any other compliance.  ECF No. 78-2 ¶¶ 6–7.  Nor does the record support that Aito was in fact confronted with any such danger warranting an OC deployment.  He was clearly free to deploy his pepper spray repeatedly directly into Holley's cell.  ECF No. 43-2 at 22:48:11–48:27; *see also* ECF Nos. 157-2 at 2–3; 157-1 ¶ 5.  And while Aito now claims his spray cannister malfunctioned, the record belies that contention.  More to the point, Holley attests to

14

having been sprayed by Aito.  The video footage corroborates that attestation.  And thus, it will be up to the trier of fact to judge whether Aito offers a credible explanation for his conduct, *see Courtney-Pope v. Bd. of Educ. of Carroll Cnty.,* 304 F. Supp. 3d 480, 489 (D. Md. 2018), or whether he deployed OC into the cell "for the sole purpose of infliction of pain."  *See Iko,* 535 F.3d at 240.

As to the remaining factors relevant to this inquiry, sufficient evidence exists to allow the claim against Aito to proceed.  Although OC spray may be a "commonly used method" of incapacitating unruly inmates so that officers may "cuff them up," *Iko*, 535 F.3d at 239, a reasonable factfinder could conclude these men were sprayed with no such purpose.  Rather, they were left to suffer the effects of the gas for nearly four hours.

 Likewise, the record reflects that no efforts were made to "temper" the effects of the spray on them.  None of the Defendant officers but Balogun and Onuma performed a welfare check, attempted to remove the inmates from the contaminated cell, rendered aid, or called for medical assistance.  *Iko*, 535 F.3d at 240.  Indeed, the record reflects that the noxious effects of the spray overwhelmed Holley and Sheppard to the point that they both passed out and had to be treated for injuries associated with having lost consciousness.  With no efforts to "temper the severity" of the OC deployments, *id.*, a reasonable factfinder could conclude that the choice to spray into the cell was sufficiently malicious and wanton so as to support an Eighth Amendment excessive force claim.  Thus, summary judgment is denied as to Aito.

Next, the Court turns to Holley's related claim that Aito, Foxx, Younas, Fekoya, Edwards, Balogun, and Hight failed to protect Holley from Aito and Foxx's excessive use of force.  ECF No. 130 ¶¶ 169–178.  Holley maintains that Aito and Younas are liable on a theory

of "bystander" liability and that Fekoya, Edwards, Balogun and Hight under a supervisory

liability theory.  ECF No. 157 at 32–33.  The Court considers each liability theory separately.

Aito and Younas may be held to account on a bystander liability theory where each

knows that (1) "a fellow officer is violating an individual's constitutional rights; (2) [he] has a

reasonable opportunity to prevent the harm; and (3) chooses not to act."  *See Dodson v. Prince*

*George's Cty.*, No. JKS-13-2916, 2016 WL 67255, at *3 (D. Md. Jan. 6, 2016) (quoting *Randall*

*v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002)).  In this respect, the relevant

conduct focuses on Aito and Foxx's use of OC spray.  Turning first to Aito, Holley asserts only

that Aito failed to report his own use of OC spray to supervisors.  ECF No. 157 at 32–33.  Holley

cannot, however, point to any evidence that Aito knew Foxx used excessive force such that Aito

would be expected to render aid.  Rather, record evidence indicates that Aito left the tier soon

after his own use of spray.  ECF No. 43-2 at 22:48:27–48:40.  Aito immediately reported to the

administrative building where he later learned from Foxx that he had deployed OC spray into the

cell.  ECF No. 78-2 ¶ 9.  But Aito also attests that he had been relieved of his duties by that point

and so could not have rendered aid.  *Id.*  Thus, when viewing the facts in the light most favorable

to Holley, nothing supports Aito's bystander liability as to Foxx' deployment of pepper spray.

Younas presents a more difficult consideration.  He can be seen walking with Foxx on

the video to perform the count.  Younas also can be seen communicating to Foxx that he had

been hit with some liquid as he approached the cell.  Shortly after, Foxx bent down and

deliberately deployed the OC fogger into the cell.  Indeed, by Foxx's own account, the decision

to use OC at that moment was impulsive and not otherwise justified.  ECF No. 78-4 at 44.  And

yet neither Foxx nor his partner Younas, returned to the cell to check on Holley's welfare.  On

this record, the Court will not grant summary judgment as to Younas.  Discovery is necessary to

ascertain fully Younas' knowledge and role in Foxx's gratuitous use of the OC fogger on Sheppard and Holley.

Turning next to supervisory liability as to Fekoya, Edwards, Balogun, and Hight.  Holley must demonstrate that each supervisor (1) had actual or constructive knowledge that Aito and Foxx were engaged in conduct that posed "a pervasive and unreasonable risk of constitutional injury to citizens like" Holley; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the practice; and (3) there was an affirmative causal link between the supervisor's inaction and the injury suffered by Holley.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *Barnes v. Wilson*, 110 F. Supp. 3d 624, 630–31 (D. Md. 2015).  "Establishing a pervasive and unreasonable risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury."  *Shaw*, 13 F.3d at 799.

To defeat summary judgment, Holley points to the fact that the supervisors "began monitoring the situation" after Aito left the wing, and thus they had "actual or constructive knowledge of the situation."  ECF No. 157 at 33.  But Aito and Foxx's use of OC was spontaneous, and even when viewing the record evidence most favorably to Holley, nothing supports that any of the supervisors knew that Aito or Foxx had deployed OC spray into the cell until after it occurred.  ECF Nos. 78-4 at 44; 103-5 ¶¶ 4,  6, 9, 33; 103-7 ¶¶ 11–12; 149-5 ¶ 4; 149-9 ¶ 6.  *See, e.g.*, *Barnes,* 110 F. Supp. 3d 624, 631 (D. Md. 2015) (no supervisory liability where conduct was "instantaneous.").

Alternatively, Holley avers that supervisors were put on notice of a pattern of correctional officers maliciously deploying OC spray because "earlier in the day in C-wing, correctional

officers had used a large amount of OC spray on an inmate and left him on the tier, rather than taking him immediately to the medical department." ECF No. 130 ¶ 37. But this mere averment, without more, cannot establish a sufficiently widespread or consistent use of OC spray such that supervisory liability is established. No facts support that any of the supervisors here were involved in the claimed earlier incident. Indeed, the Amended Complaint is bereft of any facts making plausible that the unnamed officers deployed OC or that such use was unjustified. Nor do mere "disturbances" on the disciplinary segregation wing alone establish a pattern or practice of OC deployment that can save the supervisory liability claim. ECF Nos. 78-2 ¶ 4; 103-4 ¶ 7. Accordingly, summary judgment is warranted as to Fekoya, Edwards, Balogun and Hight as to the Eighth Amendment excessive force claim.

### C. Eighth Amendment Deliberate Indifference to a Serious Medical Need (Count III)

Next, the Court turns to Holley's claim that the officers demonstrated deliberate indifference to his serious medical needs after having OC sprayed him. ECF No. 130 ¶¶ 179–185. Like his excessive force claim, for an Eighth Amendment denial of medical care claim "there is a subjective and an objective component to showing a violation of the right. The plaintiff must demonstrate that the officers acted with "'deliberate indifference' (subjective) to the inmate's 'serious medical needs'" (objective). *Iko*, 535 F.3d at 241 (quoting *Estelle,* 429 U.S. at 104).

The objective component, a "serious . . . medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). *See also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). As to the subjective prong, the inmate must show that the prison official knew

about and disregarded the "excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1970).

Defendants vigorously contend that no evidence reflects Holley had any need for medical attention, and certainly not a "serious" medical need. ECF Nos. 144-1 at 13–15, 20–22; 149-2 at 16–23. While the Court agrees that certain correctional officers describe Sheppard and Holley as "laughing" and "yelling" after they supposedly had been OC sprayed, contrary evidence paints a very different picture. Sheppard and Holley, both asthmatic, attest to having choked on OC spray to the point that they passed out. ECF Nos. 121-1 ¶¶ 4, 6; 157-1 ¶¶ 5–6. Sheppard attests to waking up to Holley unconscious and lying in his own urine. ECF No. 121-1 ¶ 8. As further corroboration, that both men were felled by the OC spray, Holley had to be transported to medical in a wheelchair. ECF Nos. 103-4 ¶ 16; 78-4 at 72.

As to the subjective prong, all officers are trained to respond to the deleterious health effects of using OC spray. Aito acknowledges, in fact, that officers must "immediately evaluate any inmate impacted by the pepper spray" and "take the inmate to medical treatment to be evaluated by a member of the medical staff" precisely because the noxious gas can do serious harm. ECF No. 78-2 ¶ 3. *See also id.* (OC fogger "should be expected to cause serious damage or death."). Accordingly, substantial evidence exists that Holley was suffering from an obvious need for medical attention after he had been sprayed. *See Iko*, 535 F.3d at 241 (use of pepper spray exposed plaintiff to a substantial risk of serious harm).

Moreover, although each Defendant denies *ever* knowing that Holley needed medical care, the four-hour delay in attending to the inmates alone warrants further evidentiary exploration. Aito and Foxx actually discussed that Foxx had unleashed the OC fogger into the cell—which alone renders shocking their subsequent lack of attention. ECF No. 78-2 ¶ 9; *see*

19

*also* ECF No. 78-4 at 44 (Officer Foxx notified his "building sergeant of the incident."). As for Younas, Edwards, Hight, Fekoya, Lawal, and Paul each claim to have been acutely aware of the "liquid assaults" that Holley evidently visited on the officers. Yet each also professes remarkable ignorance as to the officers having shot OC into the enclosed cell. Nor do the Defendants explain with any satisfaction the absence of video footage for those four hours, or their choice *not* to attempt to extract the inmates from the cell at any point. Holley is thus entitled to explore the extent to which Defendants were aware that he had been sprayed in his cell with OC and left for hours with no medical attention whatsoever. Summary judgment on this claim is denied as to Aito, Younas, Edwards, Hight, Fekoya, Lawal, and Paul.

Balogun and Onuma, however, are not similarly situated as they played far more limited roles in this incident. The record evidence uniformly establishes that Balogun and Onuma had not been working on the tier where Holley and Sheppard were housed. They instead were called to the tier around 3 a.m. and arrived minutes later. ECF Nos. 103-4 ¶ 3; 149-6 ¶¶ 16; 149-9 ¶¶ 7, 15; 149-12 ¶¶ 3–5. *See also* ECF Nos. 43-7 at 6–7, 11-12 (logbooks). Both also immediately checked on Holley and Sheppard and escorted them to the medical unit for treatment. ECF No. 43-7 at 6–7, 11–12. When viewing these facts most favorably to Holley, neither Balogun nor Onuma can be said to have acted with deliberate indifference in failing to secure Holley timely medical treatment. Summary judgment is granted in their favor as to the Eighth Amendment deliberate indifference claim.

### D.  Qualified Immunity

The Court next addresses Defendants' broad request for "qualified immunity" as to the Eighth Amendment claims. ECF Nos. 144-1 at 22–24; 149-2 at 30–32. Under the doctrine of qualified immunity, a state actor may be shielded from liability where his conduct "does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  So even where a constitutional injury is proven, a defendant may still avoid liability if the constitutional right was not "clearly established" at the time defendant is said to have engaged in the wrongdoing.  *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  But if the constitutional right was sufficiently clear such that an objectively reasonable officer in a defendant's position would have understood his conduct to have violated the right, qualified immunity does not apply.  *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Court concludes that on the current record viewed most favorably to Holley, qualified immunity does not bar the claims at this stage.  First, the rights at issue are all well-defined and clearly established.  Holley enjoys the constitutional right to be free from excessive use of OC spray, *see Iko,* 535 F.3d at 240, and the right to receive prompt and adequate medical attention to address his serious medical needs*, see id.* at 243; *Scinto*, 841 F.3d at 236*.*

Second, the factual discrepancies as to the incident and its aftermath preclude a finding that Defendants did not violate Holley's rights.  For example, record evidence permits a reasonable factfinder to conclude that Foxx and Aito deployed OC spray in Holley's cell, a close and confined space with no room for escape and for no justifiable reason.  Likewise, record evidence demonstrates that Sheppard and Holley were left for hours to suffer the deleterious effects of the OC spray, thus supporting the unwarranted and deliberate delay of attending to their serious medical needs. Accordingly, the Court cannot grant summary judgment as to the qualified immunity defense.  Defendants are free to revisit the propriety of the qualified immunity defense as to some or all of the claims.

21

### E. Exhaustion of Administrative Remedies

Defendants also argue that Holley failed to exhaust his available administrative remedies for failure to protect and deliberate indifference.  ECF No. 149-2 at 32–34.  In Defendants' view Holley's September 24, 2017 ARP did not encompass his claims for failure to protect and deliberate indifference, and he never appealed the denial of the claims that he did file.  *Id.*  The Court disagrees.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, requires that an inmate exhaust available remedies as a prerequisite to filing suit in federal court.  *See* 42 U.S.C. § 1997e(a).  Exhaustion under the PLRA compels the inmate to complete "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006).  This requirement is designed to ensure that the agency is given the opportunity to address all issues on the merits prior to the inmate filing suit in federal court.  *See id.* at 93.  Importantly, however, the Court must ensure that "any defects in exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).  Moreover, an inmate need only exhaust "available" remedies.  42 U.S.C. § 1997e(a); *see Ross v. Blake*, 578 U.S. 1174, 1858–62 (2016).  An administrative remedy is not "available" where the prisoner, "through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citing *Aquilar-Avellaveda*, 478 F. 3d at 1225; *Kaba*, 458 F.3d at 684).  Examples include where grievance procedures are so opaque as to become practically unusable and where "prison administrators thwart inmates from taking advantage of a grievance process[.]"  *Ross*, at 1159–60.

Holley was required to follow the DOC administrative grievance procedures to exhaust his administrative remedies. *See generally* Md. Code Ann. Corr. Servs., §§ 10-201 *et seq.*; Md. Code Regs. ("COMAR") 12.07.01(B)(1) (defining "ARP"). Under that process, the inmate must first file an ARP with his facility's "managing official," defined as "the warden or other individual responsible for management of the correctional facility." COMAR 12.02.28.05(D)(1); 12.02.28.02(B)(14). The inmate must file the ARP within 30 days from the date of the incident or from the date he learns of the claimed wrongdoing, whichever is later. COMAR 12.02.28.09(B). If the managing official denies the ARP or fails to respond, the inmate must note his appeal to the Commissioner of Corrections within 30 days. COMAR 12.02.28.14(B)(5). If the Commissioner of Correction denies an appeal or fails to respond, the inmate may file a grievance with the Inmate Grievance Office (IGO). COMAR 12.02.28.18; COMAR 12.07.01.05(B).

On the current record, disputed issues of fact remain as to whether Holley exhausted the administrative remedies "available" to him. Taking the evidence in the light most favorable to Holley, he began the ARP process by filing a grievance that detailed both the use of pepper spray and the officers' denial of timely medical care. ECF No. 157-2. JCI then dismissed the ARP and informed him that "no further action" would be taken on the grievance because an internal investigation was pending against the officers. ECF No. 157-3. Holley next appealed that decision to the Commissioner of Corrections and IGO, but received no response. ECF No. 157-4 (notice of appeal); 157-1 ¶¶ 14–16. At this stage, the Court is not prepared to conclude that Holley is at fault for his appeal evidently dying on the vine. *Id. See Washington v. Rounds*, 223 F. Supp. 3d 452, 460–61 (D. Md. 2016) (exhaustion satisfied where administrative remedy made "unavailable" by internal investigation); *Shiheed v. Harding*, No. GLR-18-1906, 2019 WL

3413504, at *8 (D. Md. June 19, 2019), *aff'd*, 802 F. App'x 765 (4th Cir. 2020) (declining to dismiss where ARP was dismissed pending internal investigation and correctional staff failed to advise inmate he could continue with administrative process).  Accordingly, summary judgment is denied on this ground.

### F.  Defendants' Supplemental Filing (ECF No. 150)

All Defendants but Aito and Foxx filed a "supplement" to their motion for summary judgment to address certain averments in the Amended Complaint not previously addressed in their first pleading.  ECF No. 150.  The supplement includes a new affidavit from Fekoya and supporting documents.  *Id.*  Holley moves to strike the supplements, arguing that the evidence is not "new" in any meaningful sense, and that Fekoya should have submitted this evidence as part of his original summary judgment motion.  ECF No. 151.  The Court agrees and cautions Defendants that they must abide by the deadlines and filing requirements set by this Court or risk future pleadings being stricken.  That said, the Court has reviewed the supplement and, even if wholly taken into account, the supplement does not alter the decision on the merits.  Accordingly, Holley's motion to strike (ECF No. 151) Defendants' supplement at ECF No. 150 is granted and Defendants' motion for leave to file the supplement *nunc pro tunc* (ECF No. 152) is denied.

### IV.   Conclusion

For the foregoing reasons, the motions to dismiss, or in the alternative for summary judgment, are granted as to all Defendants as to suit brought in their official capacities; on Count II as to Defendants Aito, Fekoya, Edwards, Balogun, and Hight; and on Count III as to Defendants Balogun and Onuma. ECF Nos. 144, 149.  The motions are denied in all other

respects.  Lastly, Holley's motion to strike at ECF No. 151 is granted and Defendants' motion

for leave to file the supplement at ECF No. 152 is denied.

       A separate order follows.


<u>      8/18/21                 </u>                           <u>              /s/              </u>

Date                                                  Paula Xinis

                                                   United States District Judge